**AHAVA (USA), INC., Plaintiff,**

v.

**J.W.G., LTD. Defendant.**

**No. 03 Civ. 653.**

United States District Court,
S.D. New York.

March 17, 2003.

Marc P. Misthal, Gottlieb, Rackman & Reisman, New York City, for Ahava (USA), Inc.

Ralph Fucetola, Newton, NJ, for J.W.G., Ltd.

### DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Ahava (USA), Inc. ("Ahava") filed a motion for a preliminary injunction on January 31, 2003 (the "Motion") seeking to bar defendant J.W.G., Ltd. ("JWG") from selling health and beauty care products (the "Products") that were manufactured by Dead Sea Laboratories, Ltd. ("DSL") in Israel under the trademarked brand name AHAVA and purchased by JWG in Israel to consumers in the United States through JWG's website, *www.judaicawebstore.com* (the "Website"). Follow-

ing an evidentiary hearing held before the Court on February 28, 2003 (the "Hearing"), the Court issued an Order dated February 28, 2003 granting the Motion and indicating that its findings, reasoning and conclusions would be set forth in a separate decision to be made available to the parties. Accordingly, for the reasons set forth below, the Motion is GRANTED.

## I. *FACTS*

Ahava contends that in 1993, DSL registered a U.S. trademark for the Products (the "Trademark"), which was then assigned to Ahava on January 9, 2003. (Declaration of Brett Goldberg in Support of Motion for Preliminary Injunction, dated January 29, 2003 ("Goldberg Declaration"), ¶¶ 3–4.) Ahava alleges that it has been the only authorized distributor of the Products in the United States since August of 1991, and has entered into two exclusive American distribution agreements with DSL, one in 1994 and the other in 2002. (Goldberg Declaration, ¶ 6.) Ahava also alleges that it is a separate corporate entity from DSL, and is not under any type of common control with DSL. (Goldberg Declaration, ¶ 2.)

Ahava claims that JWG has violated Sections 32, 42, and 43(a) of the Lanham Trademark Act of 1946, 15 U.S.C. § 1114(1)(a) (the "Lanham Act"); Section 526(a) of the Tariff Act, 19 U.S.C. § 1526(a) (the "Tariff Act"); the common law of the State of New York relating to unfair competition; and Section 360–1 of the New York General Business Law, by selling the Products, which JWG purchases in Israel, to American consumers through the Website. Encompassed in all of these claims is Ahava's main contention that JWG's sale of the Products circumvents Ahava's quality control inspections of all Products that enter the United States, which are performed to insure that the Products have not spoiled since their manufacture. (Goldberg Declaration, ¶ 7) Ahava asserts that such inspections are an important part of its open return policy, which allows consumers to return any unsatisfactory product for any reason. (*Id.*) Ahava contends that this policy and inspection process, along with its direct marketing, promotional, and customer service efforts, have created a stylish, upscale image for the Products among American consumers, and JWG's continued sales through its website threatens to tarnish this reputation and dilute this Trademark. (*Id.*, ¶¶ 9–16.)

JWG responds that its sales are protected by the Supreme Court's rulings on commercial free speech. JWG also makes a brief reference to its use of the Trademark as being protected under the Fair Use doctrine. In addition, JWG mentions an Implied License that it purportedly acquired from DSL to "accurately describe the products it has lawfully purchased and offers for resale to the public by stating the trade name of the products." (Defendant's Reply Memorandum, dated February 13, 2003, at 5.) Finally, at the Hearing, JWG argued that once the Products were released into the stream of commerce through their sale in Israel at retail stores, any rights under the Trademark were exhausted.

## II. *DISCUSSION*

### A. *STANDARD OF REVIEW*

In order to prevail on a motion for a preliminary injunction, a party must establish two separate components: (1) irreparable harm and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in its favor. *See Kamerling v. Massanari*, 295 F.3d 206, 214 (2nd Cir.2002). The

Court chooses to address these components in reverse order.

## B. *SUCCESS ON THE MERITS*

### 1. *Lanham Act Claim*

Ahava makes claims under three different, related sections of the Lanham Act. First, Ahava refers to Section 32, which prohibits the unauthorized sale of goods bearing a registered trademark where there is a likelihood of confusion, mistake, or deception of purchasers. *See Original Appalachian Artworks, Inc. v. Granada Electronics, Inc. ("OAA")*, 816 F.2d 68, 71 (2d Cir.1987), *cert. denied*, 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987). Next, Ahava makes a claim under Section 42 of the Lanham Act, 15 U.S.C. § 1124, which provides that "no article of imported merchandise ... which shall copy or simulate a trademark registered in accordance with the provisions of this chapter ... shall be admitted to entry at any customhouse of the United States." *Disenos Artisticos E Industriales, S.A. v. Work*, 676 F.Supp. 1254, 1270 (E.D.N.Y.1987) (citing 15 U.S.C. § 1124). Finally, Ahava makes a claim under Section 43(a) of the Lanham Act, which prohibits any person from using "in connection with any goods ... any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin, sponsorship, or approval of ... his or her goods ... by another person." *Tri–Star Pictures, Inc. v. Unger*, 14 F.Supp.2d 339, 347 (S.D.N.Y. 1998) (citing 15 U.S.C. § 1125).

Within all of these claims, Ahava primarily alleges that there is a likelihood of confusion for American consumers who purchase the Products from JWG without realizing that the Products were not subject to Ahava's supposedly rigorous quality control program, whereby all such Products "are inspected to insure that they meet the exacting standards of United States consumers." (Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction, at 7.) In particular, Ahava notes that this quality control program operates to insure that the Products have not been contaminated or outlived their shelf life, which Ahava alleges is two years. (Goldberg Declaration, ¶ 8.) Ahava contends that the "gray market goods"[1] sold by JWG have circumvented this quality control program and thus are substantially and materially different from the Products sold by Ahava.

JWG does not directly respond to this allegation or any of Ahava's other claims. Instead, in a response that manages to avoid any mention of the issues involving trademark law or the Tariff Act, JWG invokes issues of commercial free speech, citing in particular the Supreme Court's recent ruling in *Thompson v. Western States Medical Center.* However, such rulings concern matters of government regulations forbidding certain types of advertising and promotion of regulated pharmaceutical drugs, not the sale of foreign manufactured non-pharmaceutical goods by a seller who does not hold the official U.S. trademark to the goods. JWG also defends its sale of the Products under the Fair Use doctrine. That doctrine applies to the use of trademarked words or images, not the sale of trademarked products. JWG does not explain how the Fair Use doctrine would apply to the case at

---

**1.** In the lexicon of the importation business, "gray market goods" refer to "goods made by a foreign manufacturer, 'legitimately sold abroad under a particular trademark[,] ... imported into the United States and sold in competition with goods of the owner of [the United States] trademark rights in the identical mark.' " *See Helene Curtis v. Nat'l Wholesale Liquidators, Inc.*, 890 F.Supp. 152, 154 (E.D.N.Y.1995) (citations omitted).

bar. JWG additionally claims to possess an Implied License from Ahava to sell the Products, but offers no further explanation of how this Implied License was granted or how its alleged existence helps JWG defend against Ahava's claims.

 Finally, JWG argued at the Hearing that once the Products were sold to the public in Israel, all rights under the Trademark were exhausted. This type of argument has already been repudiated by this Court, which noted that where "the U.S. assignee has developed a separate goodwill factually independent from that of the [foreign] mark originator, whatever exhaustion occurred with the original release into commerce was the exhaustion of a legally distinct and factually different mark." *Osawa & Co. v. B & H Photo*, 589 F.Supp. 1163, 1171–72 (S.D.N.Y.1984); *see also Weil Ceramics and Glass, Inc. v. Dash*, 878 F.2d 659, 677 & n. 5 (3d Cir.1989) ("[I]f the exhaustion theory were viable, that would mean that once a manufacturer sold the product to the domestic markholder, the product's trademark rights were exhausted and the domestic markholder could not assert his rights under the trademark laws. That makes no sense where trademark rights may rest in nonmanufacturers and the Lanham Act recognizes the validity of the assignment of trademarks."). As a result, the Court ignores JWG's efforts to utilize an exhaustion of rights defense, and is left with only Ahava's arguments and allegations to guide it in analyzing the issues of trademark and tariff law.

 Because Ahava focuses its arguments on likelihood of confusion, the Court primarily considers Ahava's likelihood of success on the merits in connection with its claim under Section 32 of the Lanham Act.

In making a claim under this section of the Lanham Act, a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm, assuming that plaintiff has a protectable mark.[2] *See Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir. 1988); *Register.Com, Inc. v. Domain Registry of America, Inc.*, 02 Civ. 6915, 2002 WL 31894625, at *16 (S.D.N.Y. Dec.27, 2002). In deciding whether there is likelihood of confusion under the Lanham Act, the Second Circuit has inquired into whether the gray market goods being sold were genuine, "as genuine goods do not lead to customer confusion" and therefore are not protected under trademark law. *Helene Curtis*, 890 F.Supp. at 157; *see also Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, 61 (2d Cir.1992) ("[T]rademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner.").

Through a series of cases discussing whether gray market goods are genuine, the Second Circuit has developed two separate approaches to make such a determination. *See Helene Curtis*, 890 F.Supp. at 157–58 (discussing two separate Second Circuit approaches to determining whether gray market goods are genuine). First, a gray market good is not considered genuine if the goods do not meet the trademark owner's quality control standards. *See Polymer Tech. Corp. v. Mimran ("Polymer II")*, 37 F.3d 74, 78 (2d Cir.1994) ("Goods … that do not meet the trademark owner's quality control standards will not be considered genuine goods, and their sale will constitute trademark infringement."). Such a rule enforces the intention of trademark law, which "serves to guarantee the quality of the trade-

---

2. JWG does not contest the Trademark, although it does question whether the Trade-

mark can affect JWG's business that originates in Israel.

marked product." *OAA,* 816 F.2d at 75 (Cardamone, J., concurring). Without such a guarantee, "the sale of inferior goods with a true mark will clearly undermine the value of the trademarked brand as a guarantor of quality." *Polymer II,* 37 F.3d at 78.

Alternatively, a gray market good is not considered genuine if the goods (1) were not intended to be sold in the United States and (2) were materially different from the authentic goods that are authorized for sale in the U.S. market. *See OAA,* 816 F.2d at 72–73; *Helene Curtis,* 890 F.Supp. at 157–58. This rule serves to protect a domestic trademark holder's good will with consumers from damage caused by importation of similar but distinguishable goods that were never intended to be imported into the United States. *See OAA,* 816 F.2d at 73.

Along with considering whether a gray market good is genuine, some courts in the Second Circuit have paid particular attention to the likelihood of confusion as to "sponsorship"—that is, confusion as to the identity of the company that stands behind or insures the quality of the trademarked goods. *See Disenos,* 676 F.Supp. at 1269. Accordingly, even if there were no possibility of confusion as to source of origin when a product is "genuine," there might still be confusion as to sponsorship when a "genuine" product is manufactured by a foreign manufacturer but distributed in the U.S. without the authorization of and in competition with the U.S. trademark owner. *See id.*

Based on the claims alleged, the Court is persuaded that Ahava has demonstrated a likelihood of success on the merits with regard to likelihood of confusion. Analyzing the matter under the "sponsorship" theory of trademark law, the Court views the Trademark in the instant case as a symbol of the goodwill of Ahava, whose reputation backs the Products, and consequently, even if the manufacturer of the Products is accurately identified as DSL, JWG's sale of the Products could still infringe if it deceived the public into believing that Ahava's goodwill stood behind the product. *See Bell & Howell: Mamiya Co. v. Masel Supply Co.,* 548 F.Supp. 1063, 1071 (E.D.N.Y.1982), *preliminary injunction vacated on other grounds,* 719 F.2d 42 (2d Cir.1983) ("Recognizing that trademarks serve as an assurance of quality, and thus indicate more than the physical 'origin' of the goods on which they are used, Congress eliminated the 'source of origin' language as too likely to cause narrow interpretations of the statute. Congress wanted to make it clear that trademark imitations which caused confusion as to the identity of the company which stands behind or insures the quality of trademarked goods would be actionable under the statute").

### 2. *Tariff Act Claim*

Section 526(a) of the Tariff Act prohibits the importation of merchandise bearing a registered trademark owned by a U.S. trademark holder unless the U.S. trademark holder has consented in writing. *See Disenos,* 676 F.Supp. at 1271. In relevant part, the section reads:

(a) . . . it shall be unlawful to import into the United States any merchandise of foreign manufacture if such merchandise, or the label, sign, print, package, wrapper, or receptacle, bears a trademark owned by a citizen of, or by a corporation or association created or organized within, the United States, and registered in the Patent and Trademark Office by a person domiciled in the United States . . . unless written consent of the owner of such trademark is produced at the time of making entry.

. . .

(c) Any person dealing in any such merchandise may be enjoined from dealing within the United States or may be required to export or destroy such merchandise ... and shall be liable for the same damages and profits provided for wrongful use of a trademark ...

19 U.S.C. § 1526 (1999).

The Court is persuaded that Ahava is likely to succeed on this claim because Ahava meets the three main criteria embodied in the statute above, and JWG either does not dispute these facts or agrees with them. First, Ahava alleges, and JWG does not dispute, that it is the owner of the Trademark. Ahava's very recent acquisition of the Trademark only raises an issue because DSL may or may not have been a person domiciled in the United States when it registered the Trademark, as required by the statute. Second, Ahava alleges, and JWG confirms, that JWG has been importing foreign manufactured goods with the Ahava trademark into the United States for sale. Finally, Ahava contends, and JWG does not dispute, that it is a separate corporate entity from DSL and there is no common control or ownership over Ahava by DSL.[3]

## C. IRREPARABLE HARM

To establish irreparable harm in a preliminary injunction, the moving party must demonstrate not just the mere possibility of irreparable harm, but "that it is likely to suffer irreparable harm if equitable relief is denied." *JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir.1990). As previously mentioned, the existence of a likelihood of confusion in a trademark case is considered strong evidence of irreparable harm because damage to reputation is difficult to prove or quantify. *See Church of Scientology Int'l v. Elmira Mission of Church of Scientology*, 794 F.2d 38, 41 (2d Cir.1986). Thus, courts in the Second Circuit have allowed a showing of likelihood of confusion to establish both a likelihood of success on the merits and irreparable harm, assuming that plaintiff has a protectable mark. *See Hasbro*, 858 F.2d at 73.

As the Court discussed above, Ahava has convincingly shown a likelihood of confusion from JWG's sale of the Products through the Website to American consumers. Even absent a showing of likelihood of confusion, the Court is persuaded that Ahava will suffer irreparable harm in the absence of an injunction. Ahava presents evidence demonstrating the time and financial resources it has invested to establish its reputation as a high-end product in the United States, (Goldberg Declaration, ¶¶ 9–16), and JWG does not contest any of this evidence. If JWG is allowed to sell the Products through the Website at discounted prices without the quality control standards utilized by Ahava, both the undercutting of Ahava's prices and the failure to enforce quality controls could damage Ahava's reputation for selling high quality goods with consumers and retailers and threaten Ahava with a loss of both sales and prestige. *See Liz Claiborne, Inc. v. Bag Bazaar Ltd.*, 1986 WL 7003, at *3, 1986 U.S. Dist. LEXIS 24085, at *8 (S.D.N.Y. June 17, 1986).

## III. ORDER

For the reasons set forth above,[4] it is hereby

---

3. If Ahava was a corporate affiliate of DSL, then JWG could protest enforcement of the Tariff Act because the Tariff Act does not apply to goods manufactured by entities affiliated with or under common control of the foreign manufacturer.

4. Because the Court finds that relief is appropriate under Section 32 of the Lanham Act

**ORDERED** that pursuant to Rule 65 of the Fed.R.Civ.P., defendant J.W.G., Ltd., its directors, officers, agents, servants, employees, successors, assigns, subsidiaries, related companies, parent companies, licensees, and all persons in active concert or participation with it, are preliminary enjoined from (1) importing, marketing or selling beauty and health care products bearing the AHAVA mark; (2) representing to the trade or public in any way that any product sold by defendant originates from, is related in source or sponsorship to, or is in any way related to plaintiff; (3) injuring plaintiff's business reputation by tainting the distinctive quality of plaintiff's mark; (4) engaging in deceptive trade practices or acts in the conduct of defendant's business by means of selling products bearing the AHAVA mark; and (5) using plaintiff's AHAVA mark as a metatag; and it is further

**ORDERED** that defendant file with this Court and serve upon plaintiff within thirty (30) days after service of this injunction, a written report, under oath, setting forth the details of the manner and form in which defendant has complied with this injunction; and it is further

**ORDERED** that, pending the final determination of this action, the U.S. Customs Service shall prevent any shipments from defendant containing beauty and/or health care products bearing the AHAVA mark from entering the United States; and it is finally

**ORDERED** that the said preliminary injunction shall be conditioned upon the giving of security by plaintiff in the sum of $5,000, to be filed by 5:00pm on March 24, 2003 for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined.

**SO ORDERED.**

---

and Section 526(a) of the Tariff Act, the Court need not consider Ahava's alternative grounds for relief.